IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 15, 2010

IN RE NAVAEH L.

Appeal from the Chancery Court for Hamblen County
No. 2008-285    Thomas R. Frierson, II, Chancellor

No. E2009-01119-COA-R3-PT - Filed February 3, 2011

This is a termination of parental rights case concerning a minor child Navaeh L. ("the Child"), who is the daughter of Elizabeth L. ("Mother") and William T.("Father"). Separate petitions to terminate the parents' rights were filed by Nicole Q., the Child's maternal aunt, and her husband, Bryan (collectively, "Aunt and Uncle"), after the Child was adjudicated dependent and neglected, pursuant to Mother's stipulation. Following this finding, the Child was placed in the custody of Aunt and Uncle. Father's paternity of the Child was not established until after the adjudicatory hearing, but before the petition to terminate was filed. Mother and Father, represented by separate counsel, each opposed the termination of their rights. Following a bench trial, the court granted both petitions upon finding, by clear and convincing evidence, that each of the alleged grounds was established and that termination was in the best interest of the Child. As to Father, the trial court relied upon the grounds of abandonment by failure to support and failure to visit and the persistence of unremedied conditions. Father appeals.[1] We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Matt E. Miller, Morristown, Tennessee, for the appellant, William T.

Mitzi L. Sweet, Morristown, Tennessee, for the appellees, Nicole Q. and Bryan.

_____

[1]Mother also initiated a timely appeal, but this Court's records reflect that it was subsequently dismissed by order entered November 18, 2010. Accordingly, Mother is not a party to this appeal and we refer to her only as is necessary to relate the relevant facts.

# OPINION

## I.

At the time of the April 2009 bench trial, the Child was two and a half and had been in Aunt and Uncle's custody for nearly a year and a half. The proof at trial and the record before us reflects the following facts and history regarding the Child's case.

The Child was born to Mother on August 16, 2006. Mother and Father, an unmarried couple, were living together when Mother became pregnant. They told family and friends they were having a baby and Father attended the birth, but his name was not placed on the birth certificate. Mother attributed this to Father being in the process of changing his last name at that time. Father agreed that he had considered a name change, but emphatically denied that he instructed Mother not to place his name on the birth certificate. After the Child's birth, the family – Mother, Father, and the Child – lived together in a trailer at Ball Trailer Park in Morristown. Father worked while Mother stayed at home with the Child. Less than two months later, officers were called to the home to investigate a domestic disturbance. As a result, criminal domestic assault charges were brought against both parties; Mother was alleged to have stabbed and cut Father's arm with a large kitchen knife, while Father was alleged to have caused bodily harm to Mother by choking her around the neck. Both parties were convicted pursuant to their guilty pleas, but, at trial, Father could not recall ever choking Mother.

Since the Child went to live with Aunt and Uncle, Father had incurred additional charges for public intoxication (twice), failure to maintain control of a vehicle, disorderly conduct, possession of a schedule II substance, and possession of marijuana for resale, with the last charge coming the weekend before the trial in the present case.

Around September 2007, Mother moved out and left the Child with Father. By all accounts, Father forced her out of the home and would not let her take the Child. Mother stated that Father knew she had outstanding warrants and he threatened to call and have her arrested if she tried to take the Child. Instead of allowing Mother to provide daycare for the Child, Father hired a babysitter. He occasionally allowed Mother to pick up the Child and take her out. Father was the Child's primary caregiver for about two months before Aunt and Uncle took custody of her. Despite the problems between them, Mother felt that Father was a "good father" who worked hard to provide for the Child. The proof showed that both Mother and Father had multiple criminal convictions in addition to the assault charges. When the trial began, Mother was incarcerated and Father was late to court that morning because he was being arraigned for possession of marijuana for resale. Both Mother and Father agreed there had been violence in the home. According to Mother, the Child was

-2-

there on at least two occasions when she and Father hit or injured the other; Father could not recall whether the Child was present. Both parties admitted to smoking marijuana in the trailer.

Mother's relatives testified as to the Child's circumstances that led to the change of custody. Angela S. ("Grandmother"), Mother's and Aunt's mother, was an admitted recovering drug addict who testified at the outset that she had memory problems as a result of her past drug abuse. She did recall that after Mother left, Father would drop off the Child with her "every few days" and had once arrived at her house visibly drunk. Grandmother admitted that she had smoked marijuana with Father on occasions while the Child was "in the other room" and stated that she witnessed Father selling marijuana to someone outside his trailer. She had observed Mother with a black eye and marks around her neck and believed that Mother had to leave because Father "used to hit on her and stuff." Grandmother described the trailer as "very, very old," but not "filthy, filthy," and estimated she had once kept the Child for about a week when the trailer was without power or water. Grandmother had seen the Child in need of a jacket and suffering from a chronic cold that she attributed to mold in the trailer. Grandmother concluded that Father was a good parent "except for the drinking," but did not believe the trailer park was a good place to raise a child. She felt it was in the Child's best interest to live with Aunt and Uncle.

Cybil G., Grandmother's sister, had often kept the Child at her home. According to her, it was "common knowledge" that Father was the Child's biological father. Aunt and Uncle had told her initially that they were seeking custody of the Child in an effort to help Mother get on her feet and straighten out her life, but Cybil had since come to believe that their "number one goal" all along was to adopt the Child. Questioned with respect to her pre-trial interview with Aunt and Uncle's counsel, Cybil, either could not recall, or denied, telling counsel that Father regularly smoked pot and drank a lot, that she had witnessed Father driving drunk with the Child in the car, that Father was an alcoholic, that there was no stability in Father's home, that there was mold on the walls of his home, and that Father was an admitted drug dealer. At trial, she described Father as a "good father to [the Child]" and that he appeared to love the Child.

Aunt and Uncle lived in South Carolina. Aunt and Mother were biological sisters, but were not raised together and were not close. Aunt was a chiropractor who ran her own practice. Uncle was a contractor for the State Department and was an officer in the National Guard. He was also working toward completion of his master's degree in business administration. Before the Child came into their custody, Aunt and Uncle had met the Child three times on visits to Tennessee. In addition, they had taken her on a week-long vacation. According to Uncle, he and Aunt became concerned about the Child on hearing of her situation from Aunt's family members. He elaborated as follows:

-3-

[T]hey've all talked about what was going on back here in Tennessee with [the Child], the living conditions, the drug use, the drinking and we just . . . I couldn't see myself five years from now looking at her and her being in trouble or just filthy and just saying, "Sorry, I . . . [Aunt] and I thought about helping you, but we just didn't have the guts to do it and we're sorry that we didn't and we're sorry for . . . we could have provided a better life for you."

Aunt and Uncle acknowledged that most of the allegations in their petitions were not observed first-hand, but were based on things that relatives, including Mother, had told them.

On October 30, 2007, Aunt and Uncle filed a petition seeking temporary emergency custody of the Child alleging that the Child was dependent and neglected in Mother's care. In addition to Mother's most recent criminal charge for possession of drug paraphernalia three weeks earlier, the petition noted Mother's domestic assault conviction (resulting in a violation of her probation), and her history of drug use that Aunt and Uncle alleged rendered Mother incapable of caring for the Child. Further, the petition alleged that Mother "has abandoned [the Child] with a stranger, [Father], who may have no biological connection with [the Child]." Regarding Father in particular, the petition alleged that he was a "known drug dealer" with a criminal history that included domestic assault; abuse of alcohol; maintaining a home that was unclean, in need of repair, and sometimes without utilities; and was generally unable to care properly for the Child. On November 7, 2007, the juvenile court issued a temporary ex parte protective order granting custody of the Child to Aunt and Uncle. When Uncle went to the trailer to pick up the Child, he observed a broken front window facing the street and smelled smoke and mildew inside. Uncle described the Child as "dirty" and said her clothing and belongings had "the nastiest smell."

On November 14, 2007, Mother, Aunt and Uncle, appeared before the juvenile court for a preliminary hearing. Father, though not a party, also appeared. In its order, the court noted that Mother waived her right to counsel for purposes of the hearing. The court further stated: "Mother waives the preliminary hearing and stipulates that probable cause does exist that [the Child] is dependent and neglected. . . ." Accordingly, the court ordered, noting Mother's agreement, that Aunt and Uncle should continue to exercise full custody and control of the Child. As to Father, the court stated:

Father appeared pro se and did claim that he was the biological father of [the Child], but further testified that his name was not placed on the birth certificate and that he had made no efforts to legitimate [the Child]. [Father] was found to be a stranger to the

[C]hild. [Father] testified that he planned to file a Petition to Legitimate and requested DNA testing.

As a result, the court ordered Mother's counsel to assist Father in obtaining the least expensive DNA testing available. At the conclusion of the hearing, the court set the adjudicatory hearing for January 30, 2008.

At the adjudicatory hearing, Mother stipulated that there was probable cause to find that the Child was dependent and neglected as alleged in the petition for emergency custody. Pursuant to Mother's stipulation, temporary custody of the Child was awarded to Aunt and Uncle. The February 2008 order further granted once-a-month, supervised visitation with Mother (at Grandmother's home in Tennessee) but did not address Father who did not attend the hearing and whose paternity had not yet been established. After they obtained temporary custody, Aunt and Uncle drove the Child to Tennessee and back every month, a five and a half hour drive each way, to make the Child available for Mother's court-ordered visits. According to Uncle, he and Aunt first considered adoption as an option during the juvenile court proceedings "if Mother and Father didn't turn their lives around."

On May 22, 2008, after the Child had been in their custody for some six months, Aunt and Uncle filed the petitions to terminate. The petition against Father alleged that he had submitted to DNA testing in February 2008, the results of which established Father to be the Child's biological father. The petition noted that Father had not proceeded to legitimate the Child since obtaining the test results; neither had he petitioned the court or contacted Aunt and Uncle to establish visitation with the Child, nor had he provided any child support for her. The petition expressly alleged that the "conditions which led to [the Child's] removal and other conditions which would cause the [C]hild to be subjected to further abuse or neglect and prevent the minor [C]hild's safe return still persist. . . ." In his answer, Father filed a pro se statement in which he asserted: "I will not terminate my rights for any reason and am seeking full custody of [the Child]."[2]

In August 2008, Father submitted an affidavit of indigency in which he stated that he was employed in the construction field earning $350 a week. He stated he owned a car and paid $500 a month in rent. The court appointed counsel to defend Father against the petition to terminate and ordered Father to pay $200 to defray the cost of his representation. Through counsel, Father filed a formal answer denying the essential allegations of the petition – that he was unable to care for the Child, that the trailer in which he had formerly resided was unclean, unsafe, or without utilities, that he sold drugs, that the Child was exposed to drugs

---

[2]Mother, who was incarcerated since May 2008 and pregnant, also answered and sought a continuance and requested that her parents be permitted to adopt the Child.

in his home, and that he was often too drunk to care for the Child. Father admitted that he had failed to legitimate the Child, but claimed that "the excessive costs of attorney fees in addition to [his] difficulty in finding gainful employment have precluded [him] from obtaining counsel to successfully file a Petition to legitimate [the Child]." Around December 2008, Father was employed with "Team Tech" and worked there 56 hours a week at $7.00 an hour before being laid off in the weeks before trial. Before then, he was employed doing construction work for a year and concrete work for two years before that. Father described his work as "somewhat steady" before he began working for Team Tech and "steady" since then. Father said he supported the Child from the time she was born and was essentially a single parent in the months before she was removed from his care.

Father agreed that, at the November 2007 preliminary hearing, the juvenile court judge correctly characterized him as a legal "stranger" to the Child and instructed him to get a paternity test. Father never attempted to legitimate the Child because he "didn't know what to do" after the test results confirmed his paternity. Father denied that he had willfully failed to visit or support the Child – he alleged that he had been unable to physically locate Aunt and Uncle or the Child and they had refused to answer or return his phone calls. He stated that after discovering their location, he had "sent various sums of money since at least August of 2008. . . ." Under further questioning, Father conceded that the only child support he ever provided was a $300 payment he gave to the guardian ad litem for the Child in August 2008.

Father admitted his criminal history included "more than a few" convictions and conceded he was at risk of receiving jail time for his most recent offense. Father said he had not smoked marijuana in almost a year and a hair follicle drug test in January 2009 was "clean." At the time of trial, Father had no permanent home; he had moved out of the home of Denise H., his fiancé, and was living with his future mother-in-law because there was an active no-contact order prohibiting him from being around the fiancé's children. Father admitted that he was paying his fiance's rent and household bills.

At the conclusion of the trial, the court took the matter under advisement. By final order of May 29, 2009, the court terminated Father's (and Mother's) rights to the Child.

II.

Father presents the following issues taken verbatim from his brief:

> 1. Whether the trial court erred in finding that [Father] abandoned his [C]hild be willfully failing to support and by willfully failing to visit the [C]hild for the four months

-6-

immediately preceding the filing of the Petition to Terminate his parental rights.

2. Whether the trial court erred in terminating [Father's] parental rights based on persistent conditions when there was no prior adjudication of dependency and neglect against [Father].

III.

Our review of this non-jury case is *de novo*. The trial court's findings of fact, however, come to us with a presumption of correctness that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations regarding witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). No presumption of correctness attaches to the trial court's conclusions of law. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002); ***Jahn v. Jahn***, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

It is well established that parents have a fundamental right to the care, custody, and control of their children. ***Stanley v. Illinois***, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); ***In re Drinnon***, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See **Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon a finding by the court (1) "that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c)(Supp. 2007); ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful of our duty "to determine whether the trial court's findings, made under this clear and convincing standard, are supported by a preponderance of the evidence." ***In re F.R.R., III***, 193 S.W.3d at 530.

IV.

A.

Father challenges the termination of his rights based upon the ground that he had abandoned the Child by failing to support or visit her. As to both of these forms of abandonment, Father challenges the trial court's determination that his deficiencies were willful. More specifically, Father contends that he was unaware of and financially unable to meet his duty to support the Child. With respect to his failure to visit the Child, Father submits it was not willful because, he says, he faced "a significant restraint or interference" in his attempt to meet this obligation.

Tenn. Code Ann. § 36-1-113 (g)(1) provides for abandonment as a ground for termination of parental rights as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

As relevant to the present case, Tenn. Code Ann. § 36-1-102, referenced in subsection (g)(1), above, provides for the termination of parental rights on grounds of abandonment as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Under subdivision (1) of Section 36-1-102, " 'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child" and "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(D) & (E)(2007). With regard to Father, we consider these forms of abandonment in turn.

B.

The trial court found that Father failed to support the Child as follows:

> The evidence is likewise clear that [Father], during the applicable four month period, maintained gainful employment and did not pay any child support to [Aunt and Uncle]. [Father] did make one payment of $300.00 to the guardian ad litem on or about August 25, 2008. This Court therefore concludes that [Aunt and Uncle] have shown by clear and convincing evidence [Father's] wilful failure to provide support in that (1) he was aware of a responsibility to pay support, (2) he had the capacity to do so and (3) he presented no justifiable excuse for his failure. Tennessee courts have recognized that "the support of one's children should not be conditioned upon whether one has been placed under a court order to do so[.]" This Court determines that by reason of his wilful failure to pay or provide child support, [Father] has abandoned the [Child] for purposes of termination of his parental rights.

In the present case, the relevant statutory period for establishing abandonment spans from January 22, 2008, to May 22, 2008. Father concedes that he provided no child support during these four months. The question is whether his failure was willful. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). The failure to support a child is willful "when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."*Id*. at 864 (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)). *See also Tennessee Baptist Children's Home v. Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999).

At trial, the evidence was undisputed that Father always believed the Child was his and undertook his obligation to support her from the day she was born, well before his

paternity was legally established. However, he ceased supporting the Child when she left his care and did not resume supporting her even after his paternity was confirmed in March 2008. Given these facts, we find Father's contention that he was unaware of his duty to support the Child unpersuasive. At trial, the evidence showed that Father had worked since the Child was born and did construction work, at least "on and off," during the relevant four-month period. Father said although there were times when he was in between construction jobs, he always had "some" financial means to support the Child but not a lot of "extra" money. Father was cross-examined as follows:

> [Y]ou went to [the guardian ad litem's] office [in August 2008] and gave her $300.00 for the benefit of [the Child]. [Father], wasn't that an effort . . . to say, "Look, I supported my daughter and you can't terminate me now, rather than doing a thing for [the Child]?
>
> * * *
>
> [Father]: It was for my daughter.
>
> [Counsel]: Well, in the period of time since November of 2007, $300.00 is all you have given your daughter, period, am I correct?
>
> A: Yes.
>
> Q: And [Father], you don't really, . . . intend to try and convince this Court that you didn't know how that could have occurred. You had [Aunt and Uncle's] phone number, did you not?
>
> A: Yes.
>
> Q: And you had a wealth of information that you could obtain through [Mother], isn't that true?
>
> A: Correct.
>
> Q: And [Father], you've been in my office.
>
> A: Yes.

Q: You knew where I was. Could you have gone to my office and written a check for the benefit of [the Child]?

A: Yes.

Q: But you didn't?

A: No.

Q: So that's not one of those things you didn't know how to do, is it?

A: Correct.

Asked why he did not provide support for the Child, even when his employment became steady, Father replied, "I really don't know that answer." In our view, the evidence clearly demonstrates that Father was aware of his duty to support the Child and was able to provide support, but did not. In short, the evidence does not preponderate against the trial court's finding that there was clear and convincing evidence establishing that Father abandoned the Child by willfully failing to support her.

C.

The trial court also found that Father abandoned the Child by failing to visit her during the relevant four-month period. The court stated:

> With reference to [Father's] co-parenting time with the [Child], the evidence supports a finding that during the applicable four month period, he did not visit with the [C]hild. [Father] asserts that [Aunt and Uncle] thwarted his ability to visit with the [C]hild and as such, wilful abandonment has not been show to exist[.] Tennessee courts recognize that a parent may not sit on his/her visitation rights rather than actively and persistently pursuing them[.] This Court concludes that the evidence is clear and convincing that [Aunt and Uncle] did not thwart or otherwise prevent [Father] from visiting with the [C]hild and accordingly, his failure to visit during the four month period was wilful and constitutes abandonment.

-11-

As with other forms of abandonment, abandonment by failure to visit must be shown to be intentional or willful. Father asserts that his admitted failure in this area must be excused because Aunt and Uncle resisted or thwarted his efforts to establish visitation with the Child. Following our review, we conclude that the evidence to support Father's claim is essentially non-existent.

At best, the evidence established that Father called Aunt and Uncle three or four times and sometimes left messages for the Child. Father stated he called them "at least eight or nine times," but could not recall when and offered no other details. Aunt and Uncle acknowledged that Father called them once in November 2007 when they first took custody of the Child. Aunt testified that after that "we didn't hear from him again" until after the petition to terminate his rights had been filed. Aunt introduced her calendar containing detailed, contemporaneous notations of contacts with Father (but mostly Mother). It reflected that after the first call, Father called Aunt and Uncle again on June 16, 2008, (Father's Day) and on August 16, 2008, the Child's birthday. The notation on June 16 reads: "[Father] called [Aunt's] cell phone from restricted # with a message to 'tell [the Child] I love her and will see her soon.' " Father did not leave a number to return the call. On August 16, Aunt indicated that Father called and left a message "telling [the Child] Happy B-Day and to call back." Aunt said Father called again in January 2009.

Aunt and Uncle testified that Father never once called with a request to visit the Child. Aunt noted Father knew how to reach them and their phone number had not changed since the calls from him while they had the Child for a week-long vacation in 2007. Aunt noted that Father also knew her whole family, and Uncle added that there was nothing to prevent Father from going to Grandmother's house to see the Child when they brought her to Tennessee to visit with Mother. Aunt said that "to a certain point," they would have returned Father's calls if he had left a number where he could be reached. She elaborated:

> [T]he thing is he called once right after we had taken her and I
> think I did talk to him on that call, but then after that, he didn't
> call again until June of '08. By that point, we had had a bond
> with [the Child] and I didn't think it was in her best interest to
> talk to him."

Father admitted that the extent of his effort to maintain any contact with the Child since 2007 was the few calls he made to Aunt and Uncle. Father was questioned as follows:

> [Counsel]: [A]ll of that time, you never made one move to
> establish visitation with [the Child].

[Father]: I'd try to contact [Aunt and Uncle].

Q: [Father], you didn't do anything to establish any kind of visits with [the Child], did you?

A: I tried to contact [Aunt and Uncle].

Q: Other than that, you didn't do a thing to try to establish any kind of visits with [the Child], did you?

A: I didn't know how to go about it through the courts, no.

Q: [Father], you were in Juvenile Court on November 14th, am I right?

A: Yes.

Q: You were there. You knew there was a case. You knew where my office was and you knew also, did you not, sir, that visitation could be obtained through a court order?

A: I must not have understood.

Q: You went all this time without seeing your daughter and that wouldn't have concerned you enough to have talked to an attorney about it and found out what to do?

A: It concerned me very much. I was confused and didn't know what to do.

* * *

Q: It didn't concern you enough to talk to an attorney, didn't concern you enough to address it? You went all those many months and didn't visit this [C]hild. If that had been such a concern to you, why not put that at the top of the list? Why not, [Father]?

A: I don't know.

-13-

Lastly, Father contends that the trial court effectively restrained him from visiting the Child "by telling him he was not the biological father of [the Child] in November 2007." To be clear, at the November 2007 preliminary hearing, the trial court noted that Father had appeared for the scheduled hearing and claimed to be the Child's biological father, but that he admitted that he was not on the Child's birth certificate and he had not taken steps to legitimate the Child. To this end, the trial court directed Mother's counsel to assist Father in obtaining a paternity test.[3] Father ultimately submitted to a DNA test in February 2008. At that point, Father had no legal rights to the Child, so the trial court neither ordered nor prohibited visits with her. After his paternity was established, Father never returned to court to pursue visitation.

With regard to the determination of whether a parent's failure to visit his child constitutes willful abandonment, this Court has observed:

> Failure to visit . . . is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child[.]

*In re Muir*, No. M2004-02652-COA-R3-CV, 2005 WL 3076896 (Tenn. Ct. App. M.S. filed Nov. 16, 2005)(internal citations omitted). In the present case, Father's contention that Aunt and Uncle or the trial court somehow prevented him from visiting the Child is unavailing. We recall the conclusion this Court reached under similar facts in our opinion of *In re T.L.*, No. E2004-02615-COA-R3-PT, 2005 WL 2860202 at *8 (Tenn. Ct. App. E.S., filed Oct. 31, 2005), – "The fact that Father[] sat on his visitation rights rather than actively and persistently pursuing them belies his contention that he made a real effort to visit his [Child]." In summary, the evidence does not preponderate against the trial court's finding that there was clear and convincing evidence establishing Father's willful failure to visit the Child.

## V.

Next, Father challenges the trial court's finding that persistent, unremedied conditions supplied an additional ground for terminating his parental rights. Father contends that there was never a finding against him – rather only against Mother – that the Child was dependent

---

[3]The record does not indicate whether Father obtained any assistance from Mother's counsel and Father does not address this matter. In their brief, Aunt and Uncle assert that "[Father] refused to accept the assistance of the Law Office of Mitzi L. Sweet. . . ."

and neglected and, from this, reasons that his rights were not subject to being terminated on this ground. Aunt and Uncle counter that the merits of the persistent conditions ground were fully litigated at trial, and Father failed at that time to raise any objection or assert errors of law; accordingly, he may not raise this issue now. The usual rule is that issues presented for the first time on appeal are waived. *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996).

The trial court relied on Tenn. Code Ann. § 36-1-113(g)(3), which sets forth the ground commonly referred to as "persistent conditions" as one ground for terminating Father's rights. The statute applies to situations where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

The trial court found that this ground applied to Father as follows:

> With reference to [Father], the evidence is clear and convincing that he has a criminal history of various convictions for drug and alcohol related offenses since 2002. On October 12, 2006, [Father] was convicted of domestic assault regarding [Mother]. During the morning of trial in the instant action, [Father] was arraigned on additional charges. From October 2007 through March 2008, [Father] was observed on several occasions purchasing alcohol while in an intoxicated condition. [Father] currently does not possess a driver's license.

This Court concludes that the evidence is clear and convincing that the conditions which led to the [C]hild's removal and other conditions in all reasonable probability would cause [the Child] to be subjected to further abuse or neglect if returned to the care of [Mother and Father]. There is little likelihood that these conditions will be remedied at an early date. With a judicial finding of dependency and neglect existing, the Court may terminate parental rights upon this statutory ground[.] Hence, this Court concludes that [Aunt and Uncle] have carried their burden of proof in establishing this as an additional statutory ground supporting a termination of [Mother's and Father's] parental rights in the event that such is in the best interest of [the Child].

Again, Father contends that Tennessee law requires a judicial finding of dependency and neglect before a parent's rights can be terminated for failing to remedy the conditions that led to a child's removal from his or her custody. He is correct. This Court has held, "based on the statutory text and its historical development, that Tenn. Code Ann. § 36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. In this case, Mother agreed that there was clear and convincing proof to establish the Child as dependent and neglected, including allegations that were directly focused on Father, the Child's caregiver at the time – these included Father's excessive consumption of alcohol, his drug use, his lengthy and continuing criminal history including physical assaults on Mother, and the conditions he maintained in the home that he shared with the Child. Thus, in the present case, there *was* an adjudication that the Child was dependent and neglected in Father's "custody" that led, in part, to the Child's removal. An issue arises because the adjudication was based on a stipulation made by Mother when Father was not yet a party to the case and did not participate.

Our review leads to the conclusion that Father's argument has merit. At the same time, Aunt and Uncle are correct that, technically, Father has waived this issue. In any event, we conclude that we need not delve further into the issue of whether, under the facts before us, the trial court properly applied persistent conditions as a ground to terminate Father's rights. In view of our determination that abandonment by non-support and abandonment by failure to visit were sufficiently proven and that termination of Father's rights is in the best interest of the Child, we decline to further consider the trial court's disposition of the remaining ground relied upon by it. The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.

*In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) ( *abrogated on other grounds*, *In re Audrey S.*, 182 S.W.3d at 860.

## VI.

Father does not challenge the trial court's determination with respect to the best interest of the Child. Nonetheless, we are mindful that in addition to establishing that grounds for termination exist, a party seeking to terminate a natural parent's rights must also, clearly and convincingly, show that termination is in the best interest of the child. Accordingly, we have also considered whether there is clear and convincing evidence in this case to support the trial court's best-interest determination. Guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(c),[4] we conclude there is.

---

[4]The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(continued...)

On conducting its best interest analysis, the trial court found as follows:

> In determining whether termination of parental rights is in the best interest of the [C]hild, this Court determines that neither [Mother] nor [Father] have made such an adjustment of circumstances or conditions as to make it safe and in the [C]hild's best interest to reside in either of their homes. [Mother], currently incarcerated, has not shown that the conditions leading to the [C]hild's removal . . . have been remedied. [Mother] left the [C]hild in the care of [Father] in November 2007. A present, meaningful relationship between [Mother] and the [C]hild has not been shown.
>
> Regarding [Father], he has not maintained a regular visitation or contact with the [C]hild, has not provided support for the benefit of the [C]hild and has not maintained a meaningful relationship with the [C]hild since November 2007. The evidence also supports a determination that in the past [Father] has presented a history of drug and alcohol use as well as a history of criminal convictions. He currently is engaged to be married Ms. Denise H[ ]. By order of the Juvenile Court . . . filed October 30, 2008, [Father] has been ordered to "have absolutely no contact with the children" of Ms. H[ ].
>
> The evidence further supports a finding that a change of caretakers and physical home environment of [the Child] is likely to have an adverse effect on the [C]hild's emotional well being. The [C]hild has bonded closely with [Aunt and Uncle]. The physical environment of the [Aunt's and Uncle's] home appears to be healthy and safe. There does not appear to be any

---

[4](...continued)

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

history of criminal activity in the [Aunt's and Uncle's] home. According to the report of the guardian ad litem, termination of [Mother's and Father's] parental rights is in the best interest of [the Child].

The report of the Child's guardian ad litem supports the trial court's conclusion. In particular, the guardian observed that Aunt and Uncle "clearly have a very strong bond" with the Child, and she had bonded with them "as if they are her biological parents." The guardian concluded that "[the Child] would be devastated to leave her home and her support system" and "severing that bond would cause severe distress to [her]." The evidence showed that the Child had grown very close to Aunt and Uncle during their time together; she called Aunt and Uncle "Mommy" and "Daddy" and it appeared they provided her with a safe, stable, supportive, and loving environment that met all her needs. Father, on the other hand, had abandoned the Child and any bond they once shared during her infancy. In short, we conclude that the evidence does not preponderate against the trial court's factual findings and its ultimate conclusion that the Child's best interest is served by terminating Father's parental rights.

VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, William T. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE